IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2003

## STATE OF TENNESSEE v. WILLIAM BRIAN ROBINSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-383      Steve R. Dozier, Judge**

---

### No. M2002-00665-CCA-R3-CD - Filed July 11, 2003

---

The Davidson County Grand Jury indicted the Defendant for first degree premeditated murder. A Davidson County jury found the Defendant guilty as charged, and the trial court sentenced him to life imprisonment. The Defendant now appeals, claiming that the evidence was insufficient as a matter of law to sustain the verdict, and in particular, that the evidence was insufficient to prove premeditation. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Gregory D. Smith (on appeal), Clarksville, Tennessee; and Robert J. Turner (at trial), Nashville, Tennessee, for the appellant, William Brian Robinson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin N. Miller and Angelita Dalton, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

Lakeisha Green, the victim's daughter, testified that the victim had been previously married, and had gone by the names Sheila Calloway, Sheila Green, Sheila Matlock, and again Sheila Calloway, in that order. Green stated that the last time she saw her mother was around October 20, 2000, approximately three weeks before her mother's death. She testified that she had visited her mother four or five times between June and October of 2000 and that she had stayed in the house that her mother rented at 1528 22nd Avenue North. She reported that she learned of her mother's death on November 10, 2000. She testified that she met the Defendant in mid-September of 2000, and that her mother had been in a relationship with him at that time. She also stated that her mother had been right-handed. On cross-examination, Green acknowledged that her mother had been living at 1901

Murfreesboro Road, Apt. 101. On re-direct, Green affirmed that while her mother was living with the Defendant, she continued to maintain her residence on 22nd Avenue in living condition.

Officer Dan Whitley, a police officer with the Metropolitan Nashville Police Department, testified that he was assigned to South Patrol on November 9, 2000. He stated that on that date, he received a radio dispatch at 11:29 a.m., and he responded to 1901 Murfreesboro Road at 11:32 a.m. He reported that the address was an apartment complex known as the Canterchase Apartments, within Davidson County, and that he went to apartment 101. He stated that he was the first officer to arrive at the scene, and that when he knocked on the apartment door, the Defendant answered within a minute and came out of the apartment. Whitley reported seeing blood on the Defendant's hands and arms. He stated that the Defendant had his arms out and that "he just slowly turned around and put his hands back behind his back and said, "Cuff me. Cuff me." Officer Whitley described the Defendant as appearing very worried and shocked, though he could not tell if the Defendant had been crying. He reported that at the time, the Defendant said, "I messed up," but he made no other statements to him. Officer Whitley later acknowledged that that statement was not in his report, but insisted, "I do recall that he did indeed say that. It's my mistake by not putting it here in my report, but I do vividly recall him saying that." He testified that he asked the Defendant if anyone was hurt inside the apartment, to which the Defendant replied, "She is dead." He reported that he then asked the Defendant whether his own safety was at stake, and the Defendant replied, "No."

Officer Whitley testified that he handcuffed the Defendant, placed him on some steps just outside the apartment door where he could "pretty much" see him, and went inside the apartment. Inside the apartment, he found blood on the carpet, the victim lying on her back in the living room, and a large knife lying next to her body. He acknowledged that the Defendant made no attempt to flee the scene. He testified that, "[t]here was blood in the doorway area on the carpet, there was some on the walls, and there was a large amount of blood there where the victim was laying." He also stated that the Defendant had blood all over his arms and hands and that he had some on his clothing. He reported that the victim's head was propped up by a pillow, and that there were some blankets or towels and some type of breathing machine next to her. He also mentioned the presence of an ironing board. In describing the victim, Whitley stated that "[s]he looked like she was dead and lifeless and discolored; and I took her pulse, and she had no pulse and she had expired."

Whitley testified that paramedics arrived at the scene approximately ten or fifteen minutes after him. He stated that when they arrived they checked the victim for a pulse, found none, and hooked her up to an EKG machine which showed no response. He stated that after the paramedics arrived, he set up command at 11:38 a.m. and requested assistance from Homicide, Identification, and the Domestic Violence Division units. He reported the subsequent arrival of the Identification and Homicide units. Officer Whitley also testified that not long after he had arrived at the scene, Officer Mike Sanders arrived, took the Defendant, and placed him in the backseat of his car.

On cross-examination, Officer Whitley acknowledged that part of his standard procedure was to truly and accurately record in his reports any statements made by defendants or suspects.

Although, he denied that it was policy to record all statements, he noted that any statements made by a defendant or a suspect pertaining to a case would be recorded. He testified that the call from the dispatcher was announced as a code 1051, a priority code which denotes a stabbing. He testified that the dispatcher had informed the officers that "the Defendant had called his mother and explained to her that he'd gotten in a fight with his girlfriend and–and that he thought he'd killed her."

Officer Michael Sanders, a police officer of more than 13 years, testified that he also responded to the scene around 11:30 a.m. He stated that when he arrived, the Defendant was either sitting or standing outside the apartment, and Officer Whitley was standing in the doorway to the apartment where he could keep an eye on the Defendant. He reported he was not aware that the Defendant had been left alone outside by Officer Whitley prior to his own arrival. He described the Defendant as appearing upset but did not notice whether or not he was actually crying. He testified that the Defendant was cooperative.

Officer Sanders testified that while he was watching the Defendant, the Defendant began talking, stating, "I did it. I loved her. I was wrong for what I did to her." He stated that the Defendant then asked him if he was going to be charged with murder, to which Officer Sanders replied that he did not know. He further testified, "Suspect stated that he and victim got into a fight and that she, the victim, had cut him; but that he did not have to strike back, a man is supposed to be stronger than that." Sanders reported that the Defendant informed MedCom that the victim had been stabbed approximately one hour before. He testified that shortly thereafter, the Defendant was placed in the backseat of his patrol car. Sanders reported that shortly after being placed in the patrol car, the Defendant again began to talk, stating several times that "he was sorry, and he should not have done it. Suspect asked to have shoes brought out to him and also to see victim one last time." Sanders stated that he told the Defendant he would let the detective know about the Defendant's requests. He reported that after Detective Mike Smith arrived, the Defendant stated that "this would not take much investigation, that he would tell the detective anything that he wanted to know."

Sanders testified that when Detective Smith approached the car to ask Sanders a question, Sanders informed him that the Defendant had not yet been read his Miranda warnings, to which the Defendant blurted out, "I waive Miranda." Sanders stated that the Defendant was then transported to the detectives' offices, where the Defendant told Officer Sanders that the Defendant had stabbed the victim two times. Sanders testified that a tape was made while the Defendant was still in transit; however, he did not believe the tape was audible.

Sanders further testified that the only questions he asked the Defendant pertained to information needed for the booking process. He testified that because he was not sure about the Miranda warnings and because a detective was going to get involved, he followed his usual custom and did not ask any questions pertaining to the incident that led him to respond to the dispatch call.

Detective Brad Corcoran testified that he had been employed by the Metropolitan Police Department for 15 years and that he had been a detective in the Homicide Section for four years. He stated that prior to his assignment with the Homicide Section, he had worked in the Identification

Section as a crime scene investigator for nine years. He explained that as a crime scene investigator, his job had been to bring the scene of a crime to court through photography, diagrams, and physical evidence.

Detective Corcoran testified that when he arrived at the Defendant's apartment on November 9, 2000, the Defendant was already being transported. He stated that he did a walk-through of the crime scene, made an assessment, and canvassed the area to find out if any neighbors heard or saw anything.

Detective Corcoran identified in court a diagram of the crime scene. He stated that the victim's body was still present in the apartment at the time of his walk-through, and that because there were no signs of life, the body was left as it was found to aid the authorities in trying to recreate or determine what had happened. He indicated on the diagram where the body had been found, as well as an antenna, a long blood streak, a butcher knife, a microwave, and various bloodstains. Consistent with the diagram, he testified that the long blood streak was in the living area, with other bloodstains in the kitchen area, in the foyer near the door, around the wall, and close to the victim. He reported that the butcher knife was found just to the left side of the victim on the floor.

Corcoran identified photographs of the victim with the butcher knife lying to the left side of her body. Corcoran also identified photographs of a steak knife found on the kitchen table, the butcher knife found next to the victim's body, bloodstains in the foyer, bloodstains on the carpet leaving the foyer, "cast-off" stains found high on the dining room or living room wall, the view from the living room, the carpet in the living area, the bedroom, the bed and telephone, the kitchen area, including transfer-pattern bloodstains, and the kitchen floor, including a faint transfer bloodstain. Corcoran testified that the steak knife had been found on the corner of the kitchen table in the dining room.

Detective Corcoran explained that "cast-off" stains occur when blood that had been on some type of surface is "actually cast from that object or the body onto another surface." He testified that the "cast-off" stains found on the dining room or living room wall would have resulted from some type of movement, such as moving a person's hand back and forth; however, he did not know if the object that had cast the blood was a hand or one of the knives. Corcoran explained that "transfer patterns" are created when blood is transferred from one object to another through direct physical contact, as opposed to a "cast-off" motion. Corcoran further testified that most of the blood found in the apartment was at the foyer or the front door. He noted that the apartment did not appear to be in disarray, and that other than the blood, "you couldn't depict this apartment as having a sign of struggle in it." He reported that despite canvassing the area for witnesses, no one, not even the next door neighbor had seen or heard anything.

Officer William Merryman testified that he had been a police officer for twenty-six years, and that he had spent twenty-one of those years with the Metropolitan Police Department, Identification Section. He testified that he assisted in processing the crime scene. He stated that he created a diagram of the crime scene while all the evidence was still in place. He testified that he

collected twelve blood samples and a substance sample from the apartment. The blood samples were taken from a kitchen cabinet door, the east wall in the dining room, the wall behind the microwave in the kitchen, the counter top behind the microwave, the counter top near the microwave, the north wall in the living room, the kitchen floor, the floor by the front door, and the inside of the front door. He also testified that he took a sample of a red substance from the bathroom sink. He stated that when he took the blood samples, some were wet but most of them were dry, and that there was no way to tell how long the dry samples had been there.

Officer Raymond Rader, Jr. testified that he had been with the Metropolitan Police Department for twenty-six years and that he had been assigned to the Technical Investigation Section, Identification, for the past fourteen years. He reported that he was the first Identification officer to arrive on the scene and that the Defendant was still there at that point. He noted seeing a considerable amount of blood splatter on the wall, on the door, and on the floor, with the deceased victim lying on the far side of the apartment in the living room. He also collected some evidence himself, including a respirator found near the victim's body.

Detective Mike Smith testified that he had been a police detective for the Metropolitan Police Department, Homicide Division, for seventeen years, and that he had been a police officer for twenty-nine years. He stated that he was assigned as the lead investigator in this case and that he arrived at the scene of the crime just after noon. He stated that he was briefed by two patrol officers, and he then proceeded to review the scene. He reported that the Defendant was still at the scene, and that since the Defendant was willing to speak to him, the Defendant was transported by Officer Sanders to the Criminal Justice Center for a videotaped interview. Detective Smith identified in court the Defendant as the suspect he interviewed.

Detective Smith testified that prior to interviewing the Defendant, he advised him of his constitutional rights under Miranda,[1] and that this warning was included on the interview tape. Smith identified the tape at trial, and it was entered as evidence and played for the jury. During the taped interview the Defendant made reference to some injuries on his arms. Detective Smith testified that he observed these injuries, and described one as a "scratch-type of wound, and the other . . . maybe a puncture with some dry blood around it." Photographs of the Defendant in the interview room, including two of his wounds, were admitted into evidence and shown to the jury. One of the photographs depicted the Defendant's right arm, and another depicted his left arm. Smith testified that the wounds were not actively bleeding when he observed them, the Defendant did not seek medical assistance, nor was any given to him.

During the taped interview, the Defendant made a number of incriminating statements, including that the victim had barely "scraped" him and that "she wouldn't hurt [him] in a million years." The Defendant conceded that "it wasn't her fault" and stated that "she didn't do anything to justify what I did." Finally, he stated that after he stabbed the victim in the back, he "could have stopped there."

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

Detective Smith reported that after the photographs were taken, the Defendant's clothes were sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for examination. He identified the clothes in court, and they were admitted as evidence. He stated that he eventually took all the evidence collected from the apartment, as well as a sample of the Defendant's blood, to the TBI Crime Lab for analysis. He testified that he had also taken a taped statement from the Defendant's mother, Viola Robinson. Detective Smith reported that the Defendant had no apparent physical handicaps when he interviewed him, that he did not use a walker at that time, and that he did not complain of any physical ailments. The detective also stated that he took no statements from the Defendant other than those on the videotape. Detective Smith testified that the first time he saw the Defendant was in the backseat of Officer Sanders' car. He recalled that the Defendant was upset and his voice was whining and trembling. However, he did not recall that the Defendant actually was crying.

John E. Gerber, M.D., testified as an expert in the field of forensic pathology. He explained that a forensic pathologist examines autopsy tissue to determine the cause and manner of death. Dr. Gerber prepared a report of the autopsy which was performed on the victim on November 10, 2000, and it was admitted as evidence. Dr. Gerber testified that delaying the autopsy until the day after the victim's death would not affect the results, as the body was kept in a cooler which minimized any decomposition. Dr. Gerber diagnosed the cause of the victim's death as "multiple stab wounds of the torso or the chest, abdominal area," and stated that "the manner of death was determined to be a homicide." He reported that the body of the victim was five feet, three inches in height and weighed 155 pounds. He testified that the body had two stab wounds, one in the front left upper chest, and the other in the left upper back. He could not tell which wound had been inflicted first. He testified that the front wound evidenced a five to six inch penetration depth and that it resulted in a fractured left second rib, a lacerated upper lobe of the left lung, a lacerated pericardium, and a superficial penetration of the left side of the heart. He reported that the back wound had a depth of three to four inches, but that it was very superficial, meaning that it ran parallel to the surface of the body. He testified that a significant amount of force would be necessary to penetrate a rib, as was done to the victim through the frontal wound. He testified as to the size of the wounds, and after examining the butcher knife in evidence, he concluded that they were consistent with injuries that would be inflicted by the blade on such a knife. Dr. Gerber testified that the back wound alone would not have been fatal. He stated that the front wound actually killed the victim. He estimated that with those wounds, the victim could have lived for as long as twenty or thirty minutes. Dr. Gerber stated that although he could not testify to a reasonable medical certainty as to how long the victim lived, the fact that she had a collapsed lung and damage to her heart put her at great risk for a fairly sudden death. He also concluded that without urgent and immediate medical attention, the victim's injuries would be fatal.

Margaret Bash testified that she was employed by the Tennessee Bureau of Investigation Crime Laboratory as a forensic scientist, specializing in serology and DNA analysis. Bash testified that the victim's blood was found on the respirator, a piece of carpet, a blanket, a butcher knife found near the victim, and in the blood samples from the front door, the kitchen cabinet door, the east dining room wall, the counter near the microwave, the living room, and the kitchen floor. She stated

that she similarly tested a piece of antenna, but did not find blood on it. She also tested the shirt and pants that the Defendant was wearing at the time of his arrest. She found blood matching that of the victim's on the Defendant's shirt. She also found human blood on his pants; however, it contained a mixture of genetic material from more than one person, of which the victim was the primary contributor. She stated that she tested a pillow and found the presence of human blood, but there was not enough blood to complete a DNA analysis or get a profile. Finally, Bash testified that she tested the steak knife, and she found human blood, "and the DNA profile matched [the Defendant], with one locus, D-eighteen-S-fifty-one, inconclusive." However, she maintained that there was no doubt that it was the Defendant's DNA on the steak knife.

The Defendant testified on his own behalf. He gave a synopsis of his background, including three years of college education in criminal justice and work experience as a pre-trial officer, a correctional counselor, and a loss prevention supervisor. The Defendant stated that he had never been married and that he had one son. He testified that he first had contact with the victim through the Nashville Singles Line and that they had met for the first time at Temple Baptist Church in March 1999. He stated that he had been a minister at a different Church since 1997.

The Defendant testified that he dated the victim from March 1999, until June 2000, at which time they were engaged and the victim moved in with the Defendant at 1901 Murfreesboro Road, Apartment 101. He acknowledged that although the victim lived with him, she continued to maintain her residence at 1528 22nd Avenue because her daughter lived there. He stated that in November 2000, the victim was working at The Men's Warehouse across the street from Rivergate Mall, his own place of employment.

The Defendant testified that the day before the victim's death was a good day, though it ended with an argument between he and the victim about her spending too much money. He stated that there was no violence that night, but they both went to bed upset. The Defendant testified that on the morning of November 9, 2000, the victim woke up first, then he did, around 5:30 a.m. He stated that he and the victim watched television for a while, and then around 8:00 a.m., he and the victim began to argue. He testified,

"She got upset again, telling me that wasn't no man gonna tell her how to spend her money. And I kept trying to emphasize to her, I wasn't just a man, I'm the man you plan on marry (sic). And we just started swapping words back and forth, how you do—how you do in arguments, so—now it seems so silly."

The Defendant testified that he was scheduled to work that day at 10:00 a.m., and although the victim was not scheduled to work, she had volunteered the day before to go in to work that day. He testified that by the time their fight resumed, she had showered and put on her underclothes, and he had ironed a shirt for her and was working on a second. He recalled, "We got back into the argument, to where we was just swapping words back and forth. And, oh, God, it just grew. It just grew unnecessary." He maintained that prior to that day, they had never had a physical confrontation.

The Defendant indicated that the fight began at the ironing board between the front door and the living room.  He testified that when he brought up the subject of money with the victim, she went on and said that—again that, "I'm not gonna"—"I'm forty-five years old"—and the word she used was the N-word; I'm not gonna use it here in court—"gonna tell me how to spend my money."  I said again, you know, "You gotta stop"—"you can't talk to me like that.  I'm not"—"I'm not just any old"—"any old man.  I'm the one you marry."  She got mad, and she said, "Stop' b-i-t-c-hing (sic)—I don't wanna say the word"—"at me about money."  That's when she went to this table right here [indicated on Exhibit 5] and picked up—everybody keeps—I—it's constantly been called a "butcher knife"; it's a carving knife. . . . She picked that up and came at me. . . . She picked it up and then started walking towards me, right here [indicated] towards the ironing board. . . . I turned to my left, and I—and I says, "What the hell."  And I got scratched—she sent the knife across my arms.

The Defendant then rolled up his sleeves to display his scars for the jury.  He continued, "She came towards me. . . . I took my hands up . . . . and crossed those."  He then demonstrated to the jury how she had allegedly cut him while his arms were crossed.  The Defendant stated that he first learned there was an injury to the upper part of his arm when he was in the back of Detective Sanders' patrol car.  He stated that the photographs showing his injuries were taken right after the injuries happened, and that a year later he still had the scars.

The Defendant testified that the victim cut him, and then he stated, "That's when I reacted, tried to take the knife from her. . . . I took the knife, pushed it behind her.  She's shorter than I am; she was five-three.  I didn't know it at the time, but this punctured her back."  He reported that the victim held the knife in her right hand.  He continued, "And I took my right hand . . . and got the knife out, got the knife from her.  I spunned (sic) her around, and I pushed her; and that's when I stabbed her."  The Defendant testified that he had the knife in his right hand, and demonstrated how he had allegedly pushed the victim.  He testified that his going after the knife was an immediate reaction from being cut.  The Defendant asserted that he did not intend to stab or harm the victim in any way when he pushed her.  He claimed, "Sheila was the love of my life.  I didn't want anything to happen to her."

When questioned about his intent to push the victim, the Defendant stated that it was "just to get her back. . . . Just to get her back away from me."  In attempting to explain Dr. Gerber's testimony as to the force used with the wound, the Defendant stated, "I pushed her pretty hard.  I'm—I'm a short man, but I'm not exactly a small man.  And, when I pushed her, it was—it was with the force to knock somebody down."  When asked if he was in fear for his own safety regarding the knife, he replied, "I was—I was shocked and stunned; yeah.  Yeah.  I didn't know what she was gonna do with it, . . . ."  The Defendant testified that the victim had never done anything like that before.  He later stated, "I became enraged, I have to acknowledge, because I couldn't believe she came at me with a knife."  The Defendant continued, "Soon as I pushed her back, I saw blood coming from her chest.  And I don't curse normally; but, the minute I saw that blood, I said, 'Oh, shit, baby.'"

He explained that he then put his arm around the victim so that she could lean on his left side, and he attempted to walk her to the bedroom to lay her on the bed. The Defendant recalled that the victim did not make it that far, and instead stopped and lay down in the area behind the sectional, in front of the bedroom and bathroom hallway. He stated that he took a pillow off the sofa and pushed it under the victim's head, got a comforter from the bedroom to try to keep her warm, and got towels from the bathroom to apply pressure to the wound. At this point, the Defendant contends that the victim grabbed him behind his head and said, "Sweetie, I'm not gonna make it." While crying, he then described an intimate conversation that ensued between himself and the victim. He claimed, "The last words outta Sheila's mouth was she loved me with all her heart, and she started to making this gargling sound. And she gargled–she was turning her—her body towards what was her left, where I was, and she turned around and blew out. . . . And she died right there in my arms."

The Defendant estimated that the victim died no more than five to seven minutes after he stabbed her. He testified that after she died, he used his CPAP machine, which was an oxygen machine used for sleep apnea, in an unsuccessful attempt to revive her. He claimed that even after he stabbed the victim, he did not intend for her to die. As a reason for not calling 911, he stated, "She was already dead. When we set—after she set there holding me, talking to me, I wasn't thinking about anything but listening to my—to my love. And, as she died—and she died in my arms. Then, like I said, all I did was cry and hold her in—her body in my arms." He estimated that he held her for around fifteen to twenty minutes after she died.

The Defendant testified that he then called his mother and told her what had happened. He claimed that they prayed together and that she said she was going to call 911. He testified that he made no attempt to flee the scene, clean it up, or move any evidence, because he did not deny that he stabbed the Defendant; however, he testified that he did not intend to stab her. He also testified that he telephoned Brenda McKinney, a friend of his in Memphis, after talking to his mother. As his purpose for that phone call he stated, "Just the last conversation before I died." However, McKinney was apparently at work with clients and told him she would call him back. The Defendant testified that his mother called him back to notify him that she had called 911. The police arrived within a minute of that call.

The Defendant recounted the sequence of events that happened beginning with the arrival of Officer Whitley, essentially confirming the officers' testimony. He confirmed his instruction to Officer Whitley to "cuff" him, and he acknowledged that he told Whitley, "I have just stabbed my fiancé. She's inside." The Defendant testified regarding the conversation in which he assured Officer Whitley that his safety was not at stake. He claimed to have been in tears while sitting on the steps and in the back of the patrol car. The Defendant stated that the officers denied his request to see the victim one more time. He claims that while pulling away in the patrol car, he yelled out of the car, "Bye, baby. Bye, baby. Bye, baby" and that he "was completely, for lack of a better word, insane."

The Defendant acknowledged that he gave a videotaped statement to Officer Williams and Detective Smith. At trial he referred to his taped statements regarding the cuts the victim allegedly

inflicted on him. However, he insisted that he "wasn't even thinking 'bout the cuts. And I was just thinking about, you know, after I laid her down and saw that she was cut on her back, I just thinking 'bout what if I'd a just got the knife and just threw it down." Yet, he again insisted that he did not intend to stab or kill the victim. He testified that he did not take the time to look at any of his own wounds. Regarding the steak knife found on the kitchen table, the Defendant insisted that it was in no way involved in the altercation, and that it was just used to scrape material off of their iron. He had no explanation for how his blood got on it. He testified that Detective Smith took him to General Hospital and had two tubes of blood extracted from him.

The Defendant described the victim as being temperamental. He claimed to have learned in his time with her that either waking her up or criticizing her about money would trigger her temper. "I know she was really angry this time, I mean, before—beyond anything that we'd ever had before, you know." In his videotaped statement, he stated, "This wasn't her fault. After she got through complaining about money, I sat there and started talking. I may have drove her off the edge." When asked in cross-examination about this statement, the Defendant explained that he said to the victim, "If we're gonna stay together, we're gonna live like a couple, in my opinion, should." He testified that he told the victim that they would not spend any more money without each other. The Defendant claimed that he and the victim were trying to get the victim moved out of her separate residence at the time of her death. However, he admitted that the victim had her own job, her own money, and her own checking account. He denied having money problems of his own, and he denied discussing a new loan with Brenda McKinney earlier on the morning of the stabbing. The Defendant admitted that he had borrowed money from McKinney, and that he had asked neighbors for money.

Although the Defendant used a walker at his trial, purportedly for pericarditis which made his muscles weak, he acknowledged that he did not have that condition at the time of the stabbing. He testified that he worked out at a gym and that he had a muscular build at the time of the offense. He also testified that as part of his training for correctional facilities and security jobs, he was trained in self-defense and pressure point control tactics and that he had been trained in the use of a firearm and hand-to-hand combat while in the United States Army. The Defendant stated that he weighed 195 pounds and was three inches taller than the victim at the time of her death. He acknowledged that he had also had training in counseling others on domestic violence issues, but denied having such a problem himself. He reiterated that he had not received medical treatment for the cuts on his arms.

When questioned about the issue of self-defense and whether he thought the victim was getting ready to kill him, the Defendant stated, "I thought Ms.—I saw Ms. Calloway coming at me with a knife. I didn't know what the next thing—what—what was gonna come up afterwards." When asked why the butcher knife was found by the victim's body and not near the place where he had initially stabbed her, the Defendant explained, "The knife went inside . . . inside her body about five or six inches. It was inside of her. . . . I took it out, after she's stabbed; and I had it in my hand, as I was walking her over." He stated that he took the knife out almost immediately after stabbing her. He stated that he had received basic first aid training through his prior work experience. The Defendant testified, "I did what I was trained to do, which was to take the towels and put—try to

put—apply pressure on the wound." He stated, "You don't think about training, when the person you love has just been stabbed," in explanation of why he attempted to walk the victim to the bedroom despite her heavy bleeding. The Defendant testified that he was sure that the victim was dead before he attempted to revive her with the oxygen machine. He stated that he attempted to take her pulse but found none.

The Defendant admitted that he did not work during the time that the victim took a three-week leave of absence, but he maintained that he was still being paid during that time. The Defendant testified that it really was just a comment about working together on money issues that had caused the victim to go after him with a knife.

Viola Robinson, the Defendant's mother, testified that the Defendant called her on November 9, 2000 screaming, yelling, and crying. She stated that when she asked him where the victim was, he replied, "Her body is here . . . . Mama, I've killed [the victim] . . . . She cut me, but it wasn't very bad." Robinson recalled that he then started screaming again. She testified that the Defendnat told her that he had not called 911 and that he stated, "I wanted to see you and Pop, before they take me away." She stated that she told him to hang up and that she was going to call 911. She reported that after she had made the 911 call, she called her son back, told him she had called 911, and prayed with him. She estimated that he first called her between 11:00 and 12:00 p.m., eastern time. She said they had not spoken for long.

In describing the Defendant's general demeanor, Robinson noted that he was normally a mild, easy-going person, but during the phone call on November 9, 2000 he was screaming and yelling. She claimed that "he would make some rational statements and some that didn't seem to make too much sense," and said she had never seen him that upset.

Robinson asserted that she did not know very much about the relationship between the Defendant and the victim, other than that they were engaged and that she had met the victim twice. She stated that she met Brenda McKinney, and had had many more visits and conversations with McKinney than she had had with the victim. However, she testified that she did not form the opinion that the Defendant ever loved McKinney. Rather, she believed that the Defendant loved the victim.

## II. ANALYSIS

The Defendant argues on appeal that the evidence in this case was insufficient as a matter of law to sustain a verdict of guilt beyond a reasonable doubt to the charge of first degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial

evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

First degree murder is defined, in relevant part, as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Once a homicide is established, it is presumed to be second degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn.1998). In order to elevate the offense to first degree murder, the state must prove premeditation. Id.; see also State v. Brown, 836 S.W.2d 530, 543 (Tenn.1992). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. Id.

Whether a defendant acted with premeditation is a question for the jury, and it may be inferred from the manner and circumstances of the killing. State v. Holder, 15 S.W.3d 905, 914 (Tenn. Crim. App. 1999). Thus, premeditation may be established by circumstantial evidence. See Brown, 836 S.W.2d at 541. The Tennessee Supreme Court has enumerated "several circumstances which may warrant the trier of fact to find or infer premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; any threats or declarations of intent to kill made by the defendant; the procurement of a weapon; any preparations to conceal the crime which are undertaken before the crime is committed; and calmness immediately following a killing." State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000). This Court has also stated that other facts which may indicate of the existence of premeditation include the shooting of the victim after he had turned to retreat or escape, the lack of provocation on the part of the victim, and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewing the evidence in the light most favorable to the State, a jury could have reasonably found that the Defendant killed the victim after the exercise of reflection and judgment. Dr. Gerber, a forensic pathologist, testified that the victim was stabbed once in the back and once in the front. He also stated that considerable force was needed to inflict the frontal wound, and such was not consistent with an accidental stabbing. The Defendant acknowledged that the victim did not pose a serious threat to him by telling police: "She didn't stab [sic]. She just barely was scraping me. [The victim] wouldn't hurt me in a million years." He also stated that the victim "didn't do anything to justify what [he] did."

The Defendant testified that he stabbed the victim in the back and that he could have stopped, but he did not. Instead, he indicated that he pulled the knife out of her back, spun her around, pushed her, and then stabbed her again. He told Detective Sanders that even though the victim cut him, he did not have to strike back. Although the Defendant claimed that the victim cut him with the same knife with which he stabbed her, only the victim's blood that was found on the knife. The Defendant admitted that he did not call 911 after stabbing the victim, but rather he called his mother and a former girlfriend. He also acknowledged that he tried to move the victim, who was bleeding heavily, to the bedroom. Thus, there is nothing to indicate that the jury acted unreasonably in finding that the Defendant acted with a previously formed intent to kill when he stabbed the victim. See Tenn. Code Ann. § 39-13-202(d).

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE